NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

TAWNI A., SETH M., *Appellants,*

*v.*

DEPARTMENT OF CHILD SAFETY, M.A., A.M., *Appellees.*

No. 1 CA-JV 20-0294
FILED 5-4-2021

Appeal from the Superior Court in Maricopa County
No.  JD 35208
The Honorable Jo Lynn Gentry, Judge

**AFFIRMED**

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant, Tawni A.*

John L. Popilek PC, Scottsdale
*Counsel for Appellant, Seth M.*

Arizona Attorney General's Office, Phoenix
By Doriane F. Neaverth
*Counsel for Appellee, Department of Child Safety*

_____

**MEMORANDUM DECISION**

_____

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge D. Steven Williams and Judge James B. Morse Jr. joined.

_____

**C A M P B E L L**, Judge:

¶1          Tawni A. ("Mother") appeals the termination of her parental rights to her two children ("Children"). Seth M. ("Father") also appeals the termination of his parental rights to his child. The court terminated the parental rights of Mother and Father ("Parents") based on the Children's out-of-home placement for fifteen months. *See* A.R.S. § 8-533(B)(8)(c). For the following reasons, we affirm.

**BACKGROUND**

¶2          Mother gave birth to Mary in 2015 and Alan in 2017.[1] Father is the biological father of Alan. Mary's father is not party to this appeal. In September 2017, a Department of Child Safety ("DCS") specialist noticed Mother panhandling with the Children and Alan's paternal grandmother ("Grandmother"). The specialist warned the Parents not to panhandle with the Children, particularly in the Phoenix heat, and encouraged them to take Alan for a follow-up doctor's appointment.

¶3          When the DCS specialist followed up with the Parents, Mother reported she had taken Alan to the doctor. Mother told the specialist that the doctor gave Alan his required immunizations and said he was progressing normally. Two months later, a DCS specialist visited the family and observed that Mary was dirty and did not speak, and Alan was small for his age.

¶4          Later that month, a pediatrician's office reported to DCS that Alan was diagnosed with failure to thrive and had been admitted to Phoenix Children's Hospital ("PCH"). Medical records confirmed that Alan had not been seen by a doctor since leaving the hospital after he was born. PCH staff reported that while Alan was hospitalized, Mother did not appropriately care for him and a sitter was required to supervise their

_____

[1]          A pseudonym is used for each child to protect his or her identity.

interactions. DCS imposed a safety plan, requiring a paternal great-aunt to be a safety monitor for the Children.

¶5          Less than a month later, a DCS specialist again saw Mother and Grandmother panhandling with both Children in direct violation of the safety plan. DCS then removed the Children, and upon DCS's petition, the court found they were dependent.

¶6          The Parents were informed that they needed to "demonstrate an understanding of the importance of a safe and stable environment to a child's emotional, mental and physical development" before the Children could be returned. Among other things, the Parents needed to demonstrate they could protect the Children, develop appropriate parenting skills, and care for the Children's basic needs without supervision.

¶7          Dr. Kelly Rodriguez conducted a psychological examination of Mother and concluded that she "lack[ed] some insight into what is involved in providing a stable and safe environment for the healthy development of her children, as well as the parenting skills in doing so." She explained that Mother's ability to parent was not likely to improve unless she engaged in and committed to services. Dr. Rodriguez opined that Mother would benefit from doctoral-level counseling and a psychiatric evaluation to explore her seizures and depressive symptoms, which "negatively affected . . . her ability to parent her children effectively." She also recommended that mother continue parenting classes and parent-aide services.

¶8          Dr. Alex Levitan conducted a psychological examination of Father, diagnosed him with borderline intellectual functioning, and opined that his intellectual functioning "may negatively impact his ability to parent effectively as he may lack the necessary understanding, skills, and knowledge to provide a healthy and safe environment for his children." Dr. Levitan also noted that Father lacked insight into DCS's involvement, indicating an incomplete understanding of safe parenting. He recommended that Father engage in parenting classes and parent-aide services.

¶9          Based on these evaluations, DCS referred Parents for a parenting class, two parent-aide services, four case-aide services, couples counseling, individual counseling, and transportation services. DCS maintained regular communication with the Parents about the case plan and invited them to Child and Family Team meetings and the Children's

medical appointments. DCS also provided Mother with information about how to obtain housing and nutrition assistance, but she did not pursue those resources.

¶10 Father successfully completed the parenting class. Mother did not. Both Parents failed to successfully complete the first round of parent-aide services. Neither Parent engaged in the parenting program. Father never engaged in individual counseling. Mother attended only four sessions of individual doctoral-level counseling before dropping out without meeting any of her therapy goals. The Parents attended only four of the recommended couples counseling sessions.

¶11 Medical providers recommended masters-level counseling for Mother and DCS provided her with contact information for that service, but Mother did not make contact with the provider. DCS provided Father with a second individual-counseling referral, and provided Parents contact information for assistance with housing and employment resources. Father again refused to engage in counseling services, and neither took advantage of the additional resources offered.

¶12 DCS provided Mother another referral for individual counseling, this time with a master's-level professional. Mother finally engaged in counseling, disclosing that Grandmother was both verbally and physically abusive. Mother said she thought the Children were safer in foster care than with the Parents. Mother also told her counselor she had no issues to be resolved by counseling and refused to work on any of the counseling goals.

¶13 Although, in the two years this case was pending, the Parents successfully completed parent-aide services on their second attempt, DCS had lingering concerns. The Parents had not obtained safe housing or stable employment, still lacked understanding of Alan's health needs, and neither was able to recognize threats to the Children's safety. In August 2019, DCS moved to terminate Parents' parental rights based on fifteen-months out-of-home placement.

¶14 In the interim, the Parents continued to live with the abusive Grandmother and did not participate in their individual counseling. Mother also failed to take her prescribed mental-health medications. The superior court held a contested termination hearing a year later. After the hearing, the court found that DCS had diligently provided appropriate reunification services, the Children had been in out-of-home placement longer than fifteen months, and the Parents had failed to remedy the

circumstances that brought the Children into care under A.R.S. § 8-533(B)(8)(c). The court also found, by a preponderance of the evidence, that termination was in the Children's best interests. The Parents appeal.

## DISCUSSION

**¶15**        "[W]e will affirm a severance order unless it is clearly erroneous," and "we will accept the [superior] court's findings of fact unless no reasonable evidence supports those findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). A ruling is clearly erroneous when it is unsupported by substantial evidence. *Desiree S. v. Dep't of Child Safety*, 235 Ariz. 532, 534, ¶ 7 (App. 2014). The superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). We view the evidence in the light most favorable to sustaining the order. *See Maricopa Cnty. Juv. Action No. JD-5312*, 178 Ariz. 372, 376 (App. 1994).

## I.        DCS Made Diligent Efforts

**¶16**        The Parents argue the superior court abused its discretion in finding that DCS made diligent efforts to provide appropriate reunification services. We disagree.

**¶17**        DCS must make diligent efforts to provide appropriate reunification services to a parent before the court may terminate parental rights pursuant to A.R.S. § 8-533(B)(8). DCS meets this obligation by providing the parent "the time and opportunity to participate in programs designed to help [him or her] become an effective parent." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). DCS does not have to provide "every conceivable service or . . . ensure that a parent participates in each service it offers." *Id.* Nor does it have to undertake futile measures. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999).

### A.        Appropriate Service Providers

**¶18**        Mother argues DCS effectively set her up to fail by referring her to a provider that assigned her an unlicensed counseling intern. Mother failed to object to the assignment and in fact engaged in counseling with the intern. A parent who fails to object to or challenge a service offered by DCS waives the right "to argue for the first time on appeal that [DCS] failed to offer appropriate reunification services."

*Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶ 18 (App. 2014). Mother waived this issue on appeal.

**¶19**        Setting aside waiver, substantial evidence in the record strongly supports the superior court's finding that DCS offered her appropriate counseling. The DCS supervisor testified that the assignment was based on advice from psychologists, unit consultants, and Mother's previous counselor. The counseling intern testified that she had ten years of experience working at the Family Involvement Center, where she counseled Mother, and completed hundreds of hours of her internship during the time she was assigned to work with her. After reviewing the record, we conclude that DCS diligently provided Mother with appropriate reunification services.

### B.        Communications About Contacts with the Children

**¶20**        Mother next argues that DCS regularly failed to notify her about the Children's medical appointments. "When considering the [superior] court's express findings, we affirm the . . . court's order if the facts at trial support the . . . court's findings whether or not each supportive fact is specifically called out by the . . . court in its findings." *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 451–52, ¶ 19 (App. 2007). The DCS supervisor testified that both she and the previous case managers consistently e-mailed and telephoned the Parents to let them know of the Children's medical appointments. The Parents were always authorized to attend the Children's appointments, but rarely did so. Substantial evidence in the record supports the conclusion that DCS diligently communicated with the Parents about the Children's appointments.

### C.        Additional Services

**¶21**        Mother argues DCS should have provided her additional parenting services, and Father argues DCS denied his request for a housing subsidy that would have allowed them to move out of Grandmother's home. Parents also argue that DCS failed to offer them regular visits with the Children. However, neither parent cites legal authority to support their contention that the short gaps in visitation they experienced, or the denial of a housing subsidy equates to a lack of diligence by DCS.

**¶22**        The superior court found DCS offered Parents a wide variety of services "designed to help address, directly or indirectly, the issues that led to the out-of-home placement or were designed to preserve the family

relationship." The court explained that these services, which were offered over a 31-month period, "establish[ed] both reasonable and/or diligent efforts (where applicable) on the part of [DCS] to effectuate reunification of the family." Reasonable evidence in the record supports these findings.

## II.    Grounds for Termination

**¶23**          To sever a parent's rights based on fifteen-months in out-of-home placement, the court must find that DCS made a diligent effort to provide appropriate reunification services, that the parent failed to remedy the circumstances that caused the child's dependency, and that the parent would be unlikely to do so in the near future. A.R.S. § 8-533(B)(8)(c).

### A.    Termination of Father's Rights

**¶24**          Father argues the superior court failed to consider evidence showing he successfully participated in some reunification services. To the contrary, in its order terminating Father's rights, the court detailed Father's participation, or lack thereof, in the services. The court then found that "[despite two [p]arent [a]ide referrals, [F]ather was simply unable to demonstrate that he could safely and appropriately parent his son" but that "[h]is failure was certainly not due to a lack of effort." Substantial evidence in the record supported these findings.

### B.    Termination of Mother's Rights

**¶25**          Mother argues that no reasonable evidence supports the superior court's findings that she failed to remedy the circumstances that caused the out-of-home placement or that there was a substantial likelihood she would not be capable of exercising proper and effective parental care and control in the near future. Contrary to Mother's contentions, the record adequately supports the court's findings.

**¶26**          The children were declared dependent as to Mother because she failed to provide effective care and control of the Children. Additionally, as noted above, Mother's psychological exam and behavior at PCH revealed that Mother "lack[ed] some insight into what is involved in providing a stable and safe environment for the healthy development of her children, as well as the parenting skills in doing so." DCS offered a wide variety of services to Mother to address each of these issues.

**¶27**          However, Mother did not follow through with individual counseling, telling her counselor that she did not believe in counseling,

did not think she needed it, and was only engaged in the counseling because DCS required it. Eventually, Mother stopped attending the sessions altogether, claiming they "did no good." Mother also failed to complete the parenting class and program.

¶28        The DCS supervisor testified that "Mother to the best of [my] knowledge has still not addressed her mental health . . . or overall physical health." Based on her observations, the supervisor concluded that, given Parents' failure to make progress over the extended proceeding, she did not foresee them making the required changes in the near future. The superior court agreed, finding that Mother would not address her past trauma or Grandmother's ongoing abuse and the effects it had on her. It also found that, despite numerous referrals, Mother had not progressed beyond supervised visits. Substantial evidence in the record supports the court's finding that DCS proved the grounds for termination under § 8-533(B)(8)(c) by clear and convincing evidence.

### C.        Constitutionality of Termination

¶29        Father argues the evidence presented "simply did not rise to the level required to make out a constitutional claim for severance." Father's argument ignores significant findings by the superior court.

¶30        The superior court found Alan dependent because "Father [was] unwilling or unable to provide proper and effective parental care and control by neglecting to provide for the child's basic needs." DCS consulted with a licensed psychologist who recommended that Father engage in "counseling to address his problem-solving and coping skills." Father never engaged in individual counseling.

¶31        Further, in *Alma S. v. Department of Child Safety*, the Arizona Supreme Court explicitly equated the substantive grounds for termination in § 8-533(B)(8) with parental unfitness, thereby satisfying due process, "because they demonstrate a parent's inability to 'properly parent his/her child.'" 245 Ariz. 146, 150, ¶¶ 9–10 (2018) (citation omitted). Here, the DCS supervisor testified that Father lacked the ability to understand the Children's needs. The superior court observed that after Father's psychological evaluation, "his biggest barrier was his ability to safely and appropriately parent the child" and found that, at the time of the termination hearing, he remained unable to do so.

¶32        Because reasonable evidence in the record establishes the grounds for termination under § 8-533(B)(8)(c), the court did not err by terminating Father's parental rights. Father has not shown how his failure

to safely and appropriately parent Alan falls short of demonstrating parental unfitness under § 8-533(B)(8)(c).

### III.    Best Interests of the Children

**¶33**        Finally, the Parents both argue that the superior court erred by finding that severance was in the Children's best interests. "[A] determination of the child's best interest[s] must include a finding as to how the child would benefit from a severance *or* be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990) (alteration in original). "[T]he best-interests analysis requires the court to 'evaluate the totality of circumstances,' which may include the bond between the natural parent and the child, the availability of a prospective adoptive placement, risk for abuse or neglect if the relationship is not terminated, and placement with siblings." *Timothy B. v. Dep't of Child Safety*, 250 Ariz. 139, 145, ¶ 20 (App. 2020) (citation omitted).

**¶34**        The superior court found that severance was in the Children's best interests because their current placement was already meeting their needs; allowed the Children to remain together; provided the Children with a loving and nurturing home environment; and were willing to adopt. At the same time, the court found that it would be detrimental to the Children to maintain the parent-child relationship because the Parents had been unable to remedy the circumstances causing the out-of-home placement after more than two and a half years. The evidence is sufficient to sustain the court's finding that severance is in the best interests of the Children.

### CONCLUSION

**¶35**        For these reasons, we affirm the superior court's termination of Mother's parental rights as to both Children and Father's parental rights to Alan.



AMY M. WOOD • Clerk of the Court
FILED:    AA